**TRENK, DiPASQUALE,**
**DELLA FERA & SODONO, P.C.**
347 Mount Pleasant Avenue
West Orange, New Jersey 07052
(973) 243-8600
Anthony Sodono, III
Joao F. Magalhaes
*Proposed Counsel for RCC Consultants, Inc.,*
*Debtor and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| RCC CONSULTANTS, INC., | Case No. 15-18274 (___) |
| Debtor. | |

**DECLARATION OF MICHAEL W. HUNTER, PRESIDENT AND CHIEF**
**EXECUTIVE OFFICER IN SUPPORT OF FIRST DAY MATTERS**

Michael W. Hunter, pursuant to 28 U.S.C. § 1746, hereby certifies as follows:

1.    I am the President and Chief Executive Officer of Chapter 11 debtor and debtor-

in-possession RCC Consultants, Inc. ("RCC" or the "Debtor"), and as such am familiar with the

facts set forth below.

2.    I submit this Certification in support of the following first day matters:

> a)    Motion for Expedited Consideration of First Day Matters;
>
> b)    Motion for Order (A) Authorizing Debtor to Continue Using Existing Cash Management System, Bank Accounts, and Business Forms; and (B) Granting a Waiver of the Deposit Guidelines Set Forth in Section 345 of the Bankruptcy Code;
>
> c)    Motion for an Order Pursuant to 11 U.S.C. §§ 105(a), 507(a)(4) and 507(a)(5):  (I) Authorizing Debtor to Pay Certain Pre-Petition Wages, Salaries, and Payroll-Related Taxes for Pre-Petition Periods; (B) Directing All Banks to Honor Pre-Petition Checks for Payment of Pre-Petition Employee Obligations; (C) Authorizing

1

      the Debtor to Honor Workers' Compensation and Certain Employee Benefit Obligations;

d)    Debtor's Motion for a Bridge Order and a Final Order (I) Prohibiting Utility Companies from Discontinuing, Altering or Refusing Service, (II) Deeming Utility Companies to Have Adequate Assurance of Payment, and (III) Establishing Procedures for Resolving Requests for Additional Assurance Pursuant to 11 U.S.C. §§ 105(a) and 366;

e)    Application in Support of Motion Pursuant To 11 U.S.C. §§ 105, 363(c)(2)(B), 363(e), 507(b), Fed. R. Bankr. P. 4001(B), and D. N.J. L.B.R. 4001-4 In Support of Debtor's Request for Authority to Use Cash Collateral; and

f)    Application in Support of Administrative Order Pursuant to 11 U.S.C. 105(a) and 331 Establishing Certain Procedures for the Allowance of Interim Compensation and Reimbursement of Expenses of Professionals Retained by Order of This Court.

## I.    Debtor's Business, Structure, and Operations

3.    RCC is a privately held firm that was incorporated in the State of Delaware in 1983. RCC's registered agent is United Corporate Services, Inc. RCC's registered office is located at 15 East North Street, Dover, Delaware 19901. RCC is currently governed by the ByLaws of RCC Consultants, Inc. (A Delaware Corporation) (Formerly RAM Communications Consultants, Inc.). RCC is wholly-owned by RCC Holdings, Inc., a Delaware corporation.[1]

4.    RCC's principal place of business and headquarters is located at 100 Woodbridge Center Drive, Suite 201, Woodbridge, New Jersey 07095. RCC has four (4) other locations in Harrisburg, Pennsylvania; Houston, Texas; Glen Allen, Virginia; and Tallahassee, Florida. In addition, RCC has home office-based personnel in sixteen (16) states, along with home office-based personnel (one individual) in Ontario, Canada.

---

[1] RCC Holdings also wholly-owns Stream Wireless, Inc., which guaranteed a portion of RCC's below-referenced secured debt. Also, RCC Holdings is itself wholly-owned by RCC Holdings, L.L.C., a Delaware limited liability company.

5.      RCC is a global telecommunications engineering and consulting firm. Since 1983, RCC has helped public and private sector critical infrastructure clients around the world with their needs assessment, conceptual design, specifications, project and program management, procurement, funding, implementation, testing and operational support of communications systems. RCC provides expertise in a broad range of telecommunications technologies, including radio communications, data networks, command and control software systems, communications facilities, Next Generation 9-1-1, distributed antennas systems, and management of communications assets. In its history, RCC has provided services in connection with more than 4,000 projects for more than 1,000 clients (both public and private sectors). Its project experience includes complex national, state and regional communications systems used for public safety and critical infrastructure command and control.

6.      Currently, RCC has 78 full-time employees, including licensed professional engineers (PEs), project management professionals, communications industry professionals, and engineers trained in the design and operation of major manufacturers' platforms. RCC supplements its workflow needs by retaining sub-contractors when necessary.

7.      Specifically, RCC has the following lines of business:

a)  Radio communications, consisting of:

(i)      *Wireless communications:* WiMax, LTE, and WiFi; frequency planning and strategy; interference resolution; and network traffic planning and modeling.

(ii)     *Antenna towers and facilities:* Site selection, acquisition, design and development; lightning protection, grounding and bonding; equipment building design; backup power and fire suppression; antenna site management and operations;

(iii)    *Public safety and critical infrastructure radio:* VHF, UHF, 700 MHz, 800 MHz, 900 MHz, 4.9 GHz; and analog, digital, wide area and simulcast trunked and conventional radio.

(iv)  *Distributed antenna systems:* Design of neutral host systems; design of bi-directional amplifier systems; underground and in-building radiating cable systems; compliance testing; project management and acceptance testing.

b)  Network technologies, consisting of:

(i)  *Voice and data networks:* VoIP network design and engineering; solicitation development and management; PBX, voice mail and ACD administration; performance and capacity management; and call accounting services.

(ii)  *Network services:* business case and strategic planning; network planning, engineering, and construction network optimization and management; and public/private partnership and affinity services.

(iii)  *Data networks:* master planning; internet protocol (IP) based systems; network engineering and design; voice, data, and video structured cabling; and wireless data.

(iv)  *Microwave and fiber optic:* digital microwave design; analog/digital interface and conversion; microwave propagation modeling; and campus and metropolitan fiber optic network engineering.

c)  Public safety information systems, consisting of:

(i)  *Dispatch and EOC facilities:* space planning and architectural support; lightning protection, grounding and bonding; backup and uninterrupted power systems; console furniture planning and design; staffing and work flow analyses; and operations and management studies.

(ii)  *Wireless data:* public safety broadband LTE; mobile computer systems; automatic vehicle location; geographic information systems; WiFi systems; and WiMAX systems.

(iii)  *Public safety software applications:* computer aided dispatch; records management systems; field reporting; and jail management systems.

(iv)  *9-1-1 systems:* EP-1-1 emergency number telephone systems; wireless 9-1-1 performance testing and validation; next generation 9-1-1; and ESINets (emergency services IP networks).

d)  <u>Consultant and network services</u>, consisting of:

(i)     *Concept:* market analysis; program management; network assessment; business case development; and market/technology assessment.

(ii)    *Design:* engineering services and FCC/regulatory compliance studies.

(iii)   *Procurement:* contract negotiations and technology/vendor evaluations.

(iv)    *Deployment:* project management and engineering services.

(v)     *Operation support:* data analysis and network maintenance and upgrades.

e)  <u>Network engineering services</u>, consisting of:

(i)     *System design and engineering:* conventional, trunked and digital radio systems (all bands); simulcast, "cellular" frequency reuse; wireless data systems (private, public and hybrid); wireless local loop; underground RF systems; and E911 systems.

(ii)    *Network planning:* radio propagation; capacity/channel modeling; and interference identification and resolution.

(iii)   *Wireless and wireline networks:* local and wide area networks (LAN/WAN).

(iv)    *Microwave systems and network design:* point to point; point to multipoint; and relocation services.

(v)     *Acceptance testing and cutover:* quality assurance and quality control; documentation and as-built drawings; and testing and optimization of full systems or individual sites.

f)  <u>Support services</u>, consisting of:

(i)     *Facility engineering:* antenna sites; 9-1-1 centers and EOC's; grounding and lighting protection; and emergency power.

(ii)    *Site acquisition.*

(iii)   *Site management and audits.*

5

(iv)     *Regulatory support.*

(v)     *Operations and maintenance services:* network management; development of fleet templates and mapping; statistics; and spectrum management.

8.     With regard to revenues from these operations, over ninety percent (90%) are generated in connection with critical infrastructure industries: public safety, state and local governments, transportation agencies, and electric, gas and water utilities.   The remaining revenues are generated from manufacturers and education providers (K-12 and universities).

9.     As of the Petition Date, employees are owed approximately $1.3 million (consisting of 4½ missed payrolls).  Officers, performing as employees, are owed approximately $1 million (consisting of 10 missed payrolls), and have not been reimbursed for business expenses totaling approximately $250,000.

10.     All taxes, including sales and payroll, are current for all employees that have been paid.  Also, all tax filings are current or have been properly extended.

11.     The Debtor maintains a full a spectrum of all necessary and appropriate insurance policies including commercial general liability, contractual liability, automobile liability, workers compensation, architects and engineers errors and omissions, and umbrella coverage.  A copy of RCC's current Certificate of Liability Insurance is annexed as **Exhibit A.**

12.     With regard to RCC's corporate and operational history:

a)  At the time of its incorporation, RCC was formed as a subsidiary of RAM Broadcasting Corp. ("RAM"), and RCC originally did business as RAM Communications Consultants, Inc.   RAM was a pioneer in the then-rapidly growing radio paging and nacent cellular telephone businesses, and required substantial engineering support.  RCC personnel licensed, designed, implemented, operated and maintained wide area paging networks for RAM in the Northeast Corridor, Midwest (Michigan, Indiana, Ohio, Illinois), Pacific Northwest (Washington and Oregon), Rocky Mountain (Colorado, Wyoming), and Southwest (Texas, Oklahoma) regions of the United States, and on the four most populous islands of Hawaii.  RCC staff also provided support and services in the

6

design and deployment of the first generation of cellular telephone systems in Detroit, Grand Rapids, Lansing and Toledo and on the Hawaiian island of Oahu for RAM's cellular telephone subsidiary.

b) In 1984, RCC began providing consulting services to outside entities, primarily in the public safety and transportation entities. In so doing, RCC gained prestige within the public safety communications consulting industry. As the company grew, services were provided to other private and public sector clients including wireless network operators, gas and electric utilities, institutions of higher education, healthcare facilities, manufacturers, petroleum companies, and financial institutions. Offices were opened in each region of the United States and the United Kingdom to support local clients.

c) In the late 1980s, the paging business began to commoditize, and RAM sought a new line of business that would provide higher operating margins. RCC developed the concept of a shared wireless data network to support vertical market applications and, eventually, allow two-way messaging. This concept evolved into RAM Mobile Data, a national wireless data network in the United States.[2] RAM personnel developed gateways between the Internet and the wireless data network that ultimately supported the introduction of the RIM Blackberry devices into the marketplace.

d) In 1990, RCC began, among other initiatives, its tower ownership and management business, and in the years that followed developed a gateway between RMD networks and the internet to support wireless messaging.

e) In 1992, BellSouth Enterprises ("BellSouth") acquired a forty-nine percent (49%) interest in RAM through the formation of RAM/BSE Communications, L.P. ("RAM/BSE"). This investment allowed further development of the RAM Mobile Data network in the United Kingdom, Netherlands, and Australia. Around this time, RCC created a tower ownership and management business called RAM Facilities Management ("RFM"). RFM would eventually own 71 tower sites and managed several thousand towers and building rooftops for wireless installations.

f) In 1996, RAM/BSE agreed to spin-off RCC and RFM as these activities were deemed not to be core to the mobile data business. RCC and RFM were acquired by TeleCom Towers, L.L.C. ("TeleCom"); RFM assets were merged into the tower operations of TeleCom and RCC continued to operate as a separate entity. Subsequently, RCC was spun-off from TeleCom, and acquired/held by RCC Holdings, Inc., an entity owned by RCC Holdings, L.L.C.

---

[2] This network would come to be known as Cingular Wireless, which later supported the popular Blackberry and Palm wireless devices.

g) In the years that followed, RCC remained active: in 2000, building its 2,000[th] base station for RMD; in 2001, performing extensive restoration design work for communications at the former World Trade Center site; in 2002, exiting the commoditized wireless network operator service business; in 2003, developing end-to-end wireless 9-1-1 location testing system; in 2005, implementing the first 700 MHz trunked system on regional channels; and in 2013, completing a LTE planning tool and real-time propagation model.

## II.    Reasons for Bankruptcy Filing

13.     As summarized below, a variety of factors lead to the RCC's bankruptcy filing. Before seeking relief under Chapter 11, however, RCC exerted considerable time, effort and due diligence to, among other things, negotiate workouts with creditors, improve cash collection, streamline operations, and enhance revenues.  Unfortunately – and notwithstanding optimism for the future as a reorganized entity – RCC faces a myriad of immediately pressing issues warranting its petition for relief.

14.     In sum, tepid economic growth in the United States, financial stress on states and local governments, reduced Federal funding for interoperable voice radio systems, and uncertainty regarding the future course of public safety communications combined to weaken the market for RCC's core consulting services.  Consequently, after a record profitable year in 2012, RCC saw operating losses in 2013 and 2014.   Increased competition for a smaller pool of potential business (given the slowdown in land-based mobile communications system investment) was also a major factor.

15.     Therefore, RCC has endured severe liquidity problems.  As set forth elsewhere herein, RCC was unable to meet certain employee/officer payroll obligations.  A lack of liquidity also resulted in failing to meet lease obligations, and in turn, litigation being threatened by landlords.  Notably, although operating losses slowed in 2014, and have continued to lessen in 2015, the improvement in this regard has been insufficient to solve RCC's liquidity problems.

16.     Compounding RCC's fiscal straits were mounting debts owed to RCC's creditors, including subcontractors on projects, trade accounts, landlords, leasing companies, and American Express (corporate card accounts).

## III.    Chapter 11 Goals

17.     Through its Chapter 11 filing, RCC seeks to ensure stability, along with an opportunity to reorganize and reclaim profitability, while still attempting to work with all of its creditors for the mutual benefit of all involved.  Given its history of innovation and success, RCC is confident that it will be able to achieve these ends.  RCC is also confident that it will emerge from this process reorganized as a more vibrant and robust company.

18.     The breathing spell afforded by this bankruptcy proceeding is critical in that it will allow RCC to effectively reorganize its business operations and affairs free from the duress and financial pressure associated with litigation and other creditor actions.  Critically, RCC has over $10 million in "shovel ready" projects, as well as approximately 150 ongoing contracts. RCC estimates that it will generate a profit margin of approximately 15-20% in connection with such contracts, and that additional work will be requested following the completion of same.

19.     Once RCC has been provided an opportunity to fully engage in the Chapter 11 process, it will begin to formulate a plan to regain its financial footing while also addressing creditor claims and certain financial infrastructure issues.

20.     Contemporaneously with the preparation and filing of a plan of reorganization, RCC will implement a number of strategic solutions to become a more viable and efficient enterprise, including:

> a)  attempting to stabilize and grow its lines of business with in a manner that recognizes the changing public safety landscape;

b)  focusing on the diversification of its customer base into complimentary technology projects, which has already provided some growth, and will assist RCC's exit from Chapter 11;

c)  focusing on growth areas, such as next generation 9-1-1, and seeking out and creating opportunities for synergies with architecture and engineering firms related to 9-1-1/public safety facility design and distributed antenna systems.

d)  streamlining segments of RCC's operations to reduce overhead while limiting any negative effects on the quality of services and efficiency of operations;

e)  aggressively reducing accounts payable; and

f)  potentially seeking capital.

21.    Furthermore with regard to subparagraph (c) immediately above, RCC has also identified potential growth within the area of distributed antenna systems (DAS).  Given the decline in wireline telephony, the marketplace is demanding a higher quality of indoor wireless technology.  According to some analysts, the global DAS market will almost double by the year 2019.  In addition, within some sectors regulations are being enacted that require in-building coverage enhancement for public safety radio systems.  RCC has carefully examined and identified these growing needs with the marketplace for DAS, as well as the potential target customer base for services and solutions relating to same, and hopes that same will prove to be another important tool for emerging from Chapter 11.

22.    RCC is confident that the above-referenced measures will allow it to regain its financial footing.

10

## IV.    Facts Specifically Relevant to First Day Matters

### A.  Potential Secured Creditor Issues

#### 1)  TD Bank, N.A. ("__TD__" or "__Secured Creditor__")[3]

23.    RCC and Secured Creditor entered into a Revolving Credit Note ("Note') (as defined therein) dated May 31, 2007, whereby it evidenced a revolving credit facility in the amount of $3,000,000.  To secure the obligation under the Note, RCC executed and delivered to Secured Creditor a first priority lien on all assets of RCC as evidenced by a Loan and Security Agreement (as defined therein) dated May 31, 2007 (the "Loan and Security Agreement").

24.    The collateral subject to the Secured Creditor's lien is set forth in its filed UCC-1 (and continuation statement), and includes the following:

> All personal property of the Debtor of every kind and nature, wherever located, whether now owned or hereafter acquired, including without limitation, the following categories of property as defined in Revised Article 9 of the Uniform Commercial Code; goods (including inventory, equipment, fixtures, farm products and any accessions thereto), instruments (including promissory notes), documents, accounts (including health-care-insurance receivables),[4] chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, securities and all other investment property, general intangibles (including payment intangibles and software), supporting obligations and any and all proceeds of the foregoing ("collectively the "TD Secured Assets").

25.    RCC Holdings, Inc., and RCC Holdings, L.L.C. have guaranteed the payment and performance of RCC's obligations under the Note and Loan and Security Agreement as evidenced by a certain Surety and Guaranty Agreement (as defined therein) dated May 31, 2007 (the "RCC Guaranty").

---

[3] Successor by merger to Commerce Bank, N.A.
[4] Although "health-care-insurance receivables" is set forth in the financing statement, the Debtor never had nor has any "health care insurance receivables."

26.     The terms of the Loan as evidenced by the Note were modified from time to time, including a certain Modification Agreement (as defined therein) dated November 29, 2010 (the "2010 Modification Agreement").   The 2010 Modification Agreement provided that Stream Wireless, Inc. ("SWI") (an "affiliate"), became a co-borrower on the Loan evidenced by the Note.   SWI granted to Secured Creditor a lien on its personal property and assets, the maturity date of the Loan was extended until May 31, 2011, and the principal balance of the Note was increased to $4,000,000.

27.     Eventually, the Loan evidenced by the Note and prior modifications were subsequently modified by a Seventh Amendment to Revolving Credit Note and Third Amendment to Loan and Security Agreement (as defined therein) dated August 31, 2011, eighth Amendment to Revolving Credit Note and Third Amendment to Loan and Security Agreement (as defined therein) dated October 12, 2012, and the letter agreements dated August 28, 2013 and November 4, 2013.   The November 4, 2013 letter agreement extended the maturity date of the obligation evidenced by the Note until November 29, 2014.   After Secured Creditor sent a Notice of Default to RCC, the Secured Creditor agreed to extend the maturity date until February 28, 2015.

28.     Thereafter, on March 13, 2015, RCC and Secured Creditor entered into a Forbearance Agreement (as defined therein).   Effective as of March 2, 2015, the principal amount of the Note, as modified, was decreased to $3,500,000.   The Forbearance Agreement requires RCC to pay all sums due and owing by the earlier of May 28, 2015, or the occurrence of an event of default.

29.     As of April 27, 2015, Secured Creditor is owed approximately $1,870,656.37. That balance will be further reduced by collections before the Petition Date.

30.     According to the UCC Financing Statement in favor of Secured Creditor, it enjoys

a lien on, among other things, RCC's accounts.  Pursuant to RCC's books and records, accounts

receivable total approximately $4.5 million.  Most, if not all, of the receivables are collectible.

31.     In addition, Secured Creditor is secured by other assets as set forth in its financing

statement.  Thus, Secured Creditor is substantially over-secured by its collateral.

## 2)  Other UCC-Holders (together with TD, "Secured Creditors")

32.     The following parties are also secured creditors of RCC and, upon information

and belief, maintain active UCC Financing Statements:

33.     TD Equipment Finance, Inc. ("TD Equipment") filed a UCC Financing Statement

on August 7, 2009.  As per its financing statement, TD Equipment enjoys a lien on office and

other equipment.  As of April 28, 2015 TD Equipment is owed one more lease payment of

$2,504.00.  RCC intends to make that payment.

34.     Dell Financial Services, LLC ("Dell") filed a UCC Financing Statement on

August 1, 2008.  Dell filed a UCC Financing Statement Amendment on May 20, 2013.  As per

its financing statement, Dell enjoys a lien on the following collateral:

> All computer equipment and peripherals (collectively "Equipment") wherever
> located, financed under and described in the Master Lease Agreement ("MLA")
> entered into between Lessee and Lessor and all of Lessee's rights, title and
> interest in and to use any software and services (collectively    "Software")
> financed under and described in the MLA, along with any modifications or
> supplements to the MLA which are incorporated or evidenced in writing and all
> substitutions, additions, assessions and replacements to the Equipment or
> Software now or hereafter installed in, affixed to, or used in conjunction with the
> Equipment or Software and the proceeds thereof together with all payments,
> insurance proceeds, creditors or refunds obtained by Lessee from a manufacturer,
> licensor or service provider, or other proceeds and payments due and to become
> due and arising from or relating to such Equipment, Software or the MLA.

As of April 28, 2015, RCC is current on its payments to Dell.  Dell is paid approximately

$4,500.00 monthly.  RCC intends to continue to make monthly payments post-petition to Dell.

35.     GreatAmerica Financial Services Corporation ("GreatAmerica") filed a UCC Financing Statement on July 5, 2013.  As per its financing statement, GreatAmerica enjoys a lien on "various Xerox copiers, printers and their accessories and all products, proceeds and attachments."  GreatAmerica is owed $21,265.00 as of April 28, 2015.  RCC intends to continue to pay GreatAmerica on a monthly, post-petition basis.

36.     Ascentium Capital LLC ("Ascentium") filed a UCC Financing Statement on April 16, 2014.  As per its financing statement, Ascentium enjoys a lien on two (2) iBwave software systems.  The monthly payment to Ascentium is $2,012.00 per month.  RCC is current on its payments to Ascentium, and intends to continue to pay the monthly payment post-petition.

37.     With regard to all of the alleged secured creditors set forth above, RCC reserves its right to review the extent, validity and priority of the secured creditors' liens.

### 3) Adequate Protection

38.     For the reasons set forth above, and as more particularly set forth in RCC's *Application in Support of Debtor's Request for Authority to Use Cash Collateral*, Secured Creditors will be adequately protected during the pendency of its bankruptcy case.

### 4) Cash Collateral Budget

39.     The Debtor will only use alleged cash collateral in the ordinary course of its business and in accordance with the budget annexed as **Exhibit B** (the "Budget"), which projects revenues and expenses for the thirty (30) day period following the filing of RCC's petition for relief.

### B.  Debtor's Cash Management Systems, Bank Accounts, & Business Forms

40.     Currently, RCC has five (5) bank accounts (collectively, the "Bank Accounts"):

| Bank | Address | Account Number | Account Type |
|------|---------|----------------|--------------|
| TD Bank, N.A. | 90 St. George Avenue Woodbridge, NJ 07095 | XXXXXX4654 | Lockbox Account |
| TD Bank, N.A. | 90 St. George Avenue Woodbridge, NJ 07095 | XXXXXX4704 | Operating Account |
| TD Bank, N.A. | 90 St. George Avenue Woodbridge, NJ 07095 | XXXXXX4928 | Payroll Account |
| TD Bank, N.A. | 90 St. George Avenue Woodbridge, NJ 07095 | XXXXXX4936 | Site Management Account |
| TD Bank, N.A. | 90 St. George Avenue Woodbridge, NJ 07095 | XXXXXX7388 | Savings Account |

41.     In the ordinary course of its business, RCC receives, deposits, and issues checks and wire transfers into and out of the Bank Accounts.

42.     RCC's review of its Bank Accounts over the past six months shows that the balances therein have not exceeded the FDIC's deposit insurance limits, though it is possible that they will in the future.

### C.  Debtor's Payroll

43.     As noted, RCC employs approximately seventy-eight (78) individuals (the "Employees").

44.     Payroll is processed on the seventh (7th) and twentieth (20th) day of each month. The Employees are paid a bi-monthly basis.  The next payroll period is May 7, 2015, and RCC intends on making such payroll.

45.     Payroll is processed by ADP Payroll Services ("ADP"), which maintains offices at 1 ADP Boulevard, Roseland, NJ.

46.     RCC uses a dedicated payroll account that is held with TD Bank, N.A. ("TD").

15

47.     RCC is still in the process of determining if any employees are owed wages exceeding the statutory limit of $12,475.00 under Bankruptcy Code section 507(a)(4).

48.     Generally, no employee of the Debtor is paid an excessive salary.

49.     All sales and payroll taxes are current for all employees that have been paid.

50.     RCC also seeks an order authorizing it, but not directing it, to honor all liabilities to its Employees with respect to vacation, sick pay benefits, personal days, and paid holidays that arose prior to the Petition Date and to continue its pre-petition policies with respect to same going forward.

51.     RCC anticipates that its Employees will utilize any accrued vacation, sick leave, or personal days in the ordinary course, without resulting in any material cash flow requirements beyond the RCC's normal payroll obligations.

### D.  Debtor's Utilities

52.     RCC incurs utility expenses in the ordinary course of business for, among other things, electricity, internet, and telephone service.

53.     The following is a list of RCC's utility companies along with the proposed amounts for two-week deposits:

| Utility Company & Address | Type of Service | Account Number | Proposed Security Deposit |
|---|---|---|---|
| City of Tallahassee 435 N. Macomb Street Tallahassee, FL  32301-1262 | Electric | $482.00 | $241.00 |
| Wick Companies 100 Woodbridge Center Drive Woodbridge, NJ  07095 | Electric | $1,990.00 | $995.00 |
| AT&T PO Box 5001 Carol Stream, IL  60197 | Telephone | $103.00 | $51.00 |
| Century Link PO Box 1319 | Telephone | $203.00 | $101.50 |

| | | | |
|---|---|---|---|
| Charlotte, NC  28201-1319 | | | |
| Star2Star Communications<br>600 Tallevast Road<br>Suite 202<br>Sarasota, FL  34243 | Telephone | $284.00 | $142.00 |
| Star2Star Communications<br>600 Tallevast Road<br>Suite 202<br>Sarasota, FL  34243 | Telephone | $375.00 | $187.50 |
| Star2Star Communications<br>600 Tallevast Road<br>Suite 202<br>Sarasota, FL  34243 | Telephone | $262.00 | $131.00 |
| Star2Star Communications<br>600 Tallevast Road<br>Suite 202<br>Sarasota, FL  34243 | Telephone | $284.00 | $142.00 |
| Star2Star Communications<br>600 Tallevast Road<br>Suite 202<br>Sarasota, FL  34243 | Telephone | $458.00 | $229.00 |
| Premiere Global Services<br>PO Box 404351<br>Atlanta, GA  30384-4351 | Telephone | $20.00 | $10.00 |
| Cox Communications<br>1400 Lake Hearn Drive<br>Atlanta GA 30319 | Telephone | $100.00 | $50.00 |
| Verizon<br>PO Box 4833<br>Trenton, NJ  08650-4833 | Telephone | $135.00 | $67.00 |
| Verizon<br>PO Box 28000<br>Lehigh Valley, PA  18002-8000 | Telephone | $30.89 | $15.00 |
| Frontier<br>PO Box 20550<br>Rochester, NY 14602-0550 | Telephone | $63.00 | $31.50 |
| Airsprint Inc.<br>File 1422<br>1801 W. Olympic Boulevard<br>Pasadena, CA 91199 | Internet | $794.00 | $397.00 |
| Comcast Cable (PA)<br>PO Box 105184<br>Atlanta, GA 30348-5184 | Internet | $135.00 | $67.50 |
| Comcast Cable (FL)<br>PO Box 3006<br>Southeastern, PA  19398-3006 | Internet | $210.00 | $105.00 |
| Paetec<br>PO Box 9001111 | Internet | $87.00 | $43.50 |

| | | | |
|---|---|---|---|
| Louisville, KY  40290-1111 | | | |
| Paetec<br>PO Box 9001111<br>Louisville, KY  40290-1111 | Internet | $1,108.00 | $554.00 |

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

> /s/ *Michael W. Hunter*
> MICHAEL W. HUNTER

Dated: May 1, 2015

4837-2813-8275, v. 1

# EXHIBIT  A

**ACORD®** — RCCO-100    LICA

# CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 7/8/2014 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | (973) 731-0806 | CONTACT NAME: | |
|---|---|---|---|
| Herbert L. Jamison & Co., LLC | | PHONE (A/C, No, Ext): | FAX (A/C, No): |
| 20 Commerce Drive, Second Floor | | E-MAIL ADDRESS: | |
| Cranford, NJ 07016 | | | |

| | | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|---|
| | | INSURER A : Great Northern Ins. Co. of New Jersey | |
| INSURED | RCC Consultants, Inc. | INSURER B : Federal Insurance Company | 124 |
| | 100 Woodbridge Center Drive, Suite 201 | INSURER C : Federal Insurance Company | |
| | Woodbridge, NJ 07095- | INSURER D : Alterra Excess & Surplus Ins. Co. | |
| | | INSURER E : | |
| | | INSURER F : | |

| COVERAGES | CERTIFICATE NUMBER: | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | **GENERAL LIABILITY** <br> X COMMERCIAL GENERAL LIABILITY <br> CLAIMS-MADE X OCCUR <br> X **Contractual Liability** <br> GEN'L AGGREGATE LIMIT APPLIES PER: <br> POLICY PRO-JECT X LOC | X | | 3580-91-70 | 7/7/2014 | 7/7/2015 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ 1,000,000 |
| | | | | | | | | $ |
| B | **AUTOMOBILE LIABILITY** <br> ANY AUTO <br> ALL OWNED AUTOS SCHEDULED AUTOS <br> X HIRED AUTOS X NON-OWNED AUTOS | | | 73528728 | 7/7/2014 | 7/7/2015 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (PER ACCIDENT) | $ |
| | | | | | | | | $ |
| B | X **UMBRELLA LIAB** X OCCUR <br> EXCESS LIAB CLAIMS-MADE <br> DED RETENTION $ | | | 79836868 | 7/7/2014 | 7/7/2015 | EACH OCCURRENCE | $ 5,000,000 |
| | | | | | | | AGGREGATE | $ 5,000,000 |
| | | | | | | | | $ |
| C | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y / N <br> ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? <br> (Mandatory in NH) <br> If yes, describe under DESCRIPTION OF OPERATIONS below | | N / A | 71710480 | 7/7/2014 | 7/7/2015 | WC STATU-TORY LIMITS OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 500,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 500,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 500,000 |
| D | **Architects & Engineers E & O** | | | MAX7PL0001369 CLAIMS MADE | 7/7/2014 | 7/7/2015 | Per Claim/Aggregate | 2,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (Attach ACORD 101, Additional Remarks Schedule, if more space is required)
**Certificate holder is listed as an additional insured under General Liability if required by lease or contract and subject to policy terms and conditions.**

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Office of the United States Trustee <br> - | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. <br><br> AUTHORIZED REPRESENTATIVE <br> *Carol K. Liebl* |

© 1988-2010 ACORD CORPORATION. All rights reserved.

ACORD 25 (2010/05)    The ACORD name and logo are registered marks of ACORD

# <u>EXHIBIT  B</u>

# EXHIBIT  A

**RCC Consultants, Inc.**
**Post filing 30 day budget - May 2015**

|  | ( $000 ) |
|---|---:|
| **Cash Availability** | |
| Cash receipts expected in the lockbox | 875 |
| Cash available in bank account | 163 |
| Total | 1,038 |
| | |
| **Expenses** | |
| Payroll | 830 |
| Disability/life premium (amount owed 50) | 20 |
| Employee paid AFLAC, Vision, voluntary life | 10 |
| Rents (total owed 350) | 42 |
| Employee travel expense | 25 |
| Misc phone, internet, office expense | 25 |
| Subcontractor payments | 35 |
| United States Trustee quarterly fees (1 month) | 3 |
| Interest on TD Bank loan at prime + 4% | 12 |
|   pursuant to current facility agreement | |
|   current loan balance = $1.9 million | |
| Total | 1,002 |
| | |
| **Cash availability less expenses** | 36 |